UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

WESCO, INC., and WESCO, INC.
CAFETERIA PLAN AND
EMPLOYEE BENEFIT PLAN, on
behalf of themselves and a class of all
others similarly situated,

      Plaintiffs,

v.

BLUE CROSS BLUE SHIELD OF
MICHIGAN,

      Defendant.

Case No.

Hon.

**CLASS ACTION**

---

## CLASS ACTION COMPLAINT

Plaintiffs Wesco, Inc. ("Wesco") and Wesco, Inc. Cafeteria Plan and Employee Benefit Plan ("Plan"), on behalf of themselves and all other members of the putative class (the "Class") defined below, state for their Class Action Complaint against Defendant Blue Cross Blue Shield of Michigan ("BCBSM") as follows:

## NATURE OF ACTION

1.    This dispute arises from BCBSM's ongoing and systematic violations of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, *et seq.*, whereby, instead of fulfilling its statutory duty to safeguard plan assets, BCBSM orchestrated an elaborate, self-dealing scheme to use plan assets for its own

gain through a pattern of prohibited transactions deceptively portrayed as cost-saving measures.

2.      At all relevant times, BCBSM entered into administrative services contracts with Plaintiffs and all other members of the putative Class, agreeing to administer their self-funded healthcare benefit plans.

3.      In this fiduciary role, BCBSM was obligated to act prudently, solely in the interests of the self-funded plans and their participants, and refrain from engaging in statutorily prohibited self-dealing transactions.

4.      Contrary to these obligations, BCBSM unilaterally enrolled all self-funded customers and their plans—including Wesco, the Plan, and the putative Class members—into a complex and convoluted "Shared Savings Program" ("SSP").

5.      Through its SSP, BCBSM surreptitiously and unlawfully extracts excessive compensation for itself, at the direct expense of its self-funded customers and their plans, in violation of ERISA.

6.      BCBSM misrepresents the nature of the SSP fees it charges, labeling such fees as compensation for so-called "savings" achieved through certain "cost-containment" measures supposedly taken by BCBSM, such as detecting or recovering past overpayments to providers or preventing improper adjudication of future payments.  These so-called "savings" are mostly, if not entirely, corrections of BCBSM's own administrative errors.

2

7.      Under the guise of the SSP, BCBSM imposes fees of up to 30% of what it purportedly "recovers" or "prevents" from being improperly paid.  This fee structure, combined with BCBSM's discretionary control over plan assets, perversely incentivizes BCBSM to make or allow more administrative "errors" (*e.g.*, overpayments or other improper payments), as each "error" provides an opportunity for BCBSM to collect additional fees from the very plans it is supposed to protect.

8.      Far from benefitting the Plaintiffs or Class members, the SSP was designed and functions to enrich BCBSM at Plaintiffs' and Class members' expense.

9.      In short, BCBSM imposes a fee (paying itself) for correcting mistakes it was obligated to avoid in the first place.

10.      Such misconduct is prohibited by ERISA, which forbids fiduciaries like BCBSM from engaging in self-dealing or placing their own interests above those of the plans and plan enrollees they serve.

11.      The Sixth Circuit has affirmed BCBSM's status as an "ERISA Fiduciary" when "exercising discretion over its own compensation" under the SSP and has ruled that BCBSM's self-dealing SSP scheme is "presumptively unlawful." *Tiara Yachts, Inc. v. Blue Cross Blue Shield of Michigan*, No. 24-1223, 2025 WL 1453273, at *6, *9 (6th Cir. May 21, 2025).

12.      Plaintiffs bring this action to hold BCBSM accountable for its unlawful self-dealing and breaches of fiduciary duties, to recover the losses suffered by

Plaintiffs and the Class members because of BCBSM's violations of ERISA, to obtain restitution and disgorgement of BCBSM's fees obtained through its SSP, and to be awarded all other appropriate relief, legal or equitable, that this Court deems just and proper.

## PARTIES, JURISDICTION, AND VENUE

13.     Wesco, a 55-year-old family-owned and operated chain of gas station convenience stores, is a Michigan corporation.

14.     Wesco is in the business of operating gas station convenience stores throughout Michigan.

15.     Wesco sponsors a self-funded employee health benefits plan—the Plan—to cover the health care needs of its employees and their dependents.

16.     The Plan is an ERISA-governed, self-funded benefit plan.  At all times relevant to this Complaint, the Plan was an employee welfare benefit plan under ERISA § 3(1), 29 U.S.C. § 1002(1).

17.     Wesco is the Plan's named fiduciary and plan sponsor, as those terms are defined, respectively, in Section 402(A)(1) and 3(16)(B) of ERISA, 29 U.S.C. §§ 1102(a)(1) and 1002(16)(B).

18.     Wesco brings this action on behalf of the Plan and in its capacity as the Plan sponsor under Section 502(a)(2) of ERISA, 29 U.S.C. § 1132(a)(2).

19.     During all times relevant to this dispute, Wesco (like the plan sponsor Class members) opted to self-fund its Plan.

20.     So, rather than buy health insurance from another company, Wesco (as the Plan sponsor) funds the Plan and pays for its employees' medical costs according to the Plan's terms rather than buying health insurance to cover employee health care claims.

21.     BCBSM is a nonprofit mutual insurance company that operates under Chapter 58 of the Michigan Insurance Code, MCL 550.1101, *et seq*, with its principal place of business located at 600 E. Lafayette Blvd., Detroit, Michigan 48226.

22.     BCBSM underwrites and sells policies of health insurance, and also administers self-funded health benefit plans.  It holds itself out as providing services to a variety of health benefit plans, including individual health benefit plans and group plans, such as employer-sponsored plans.

23.     BCBSM is the largest health benefit company in Michigan, insuring or administering health benefits to more than 5 million individuals.

24.     Despite claiming to be a "nonprofit," BCBSM holds massive excess surplus levels built off the net income derived from the fees BCBSM collects from self-funded plans and their sponsors, including the Plaintiffs and members of the Class, defined below.

5

25.     BCBSM often claims these surpluses are designed as reserves for future insurance payments, but they are used as strategic monies to develop and implement schemes to sift more money for itself out of its self-funded customers.

26.     For instance, many BCBSM executives take exorbitant bonuses derived from the fees BCBSM charges to its customers, like those at issue in this case. "[T]otal all-cash compensation for CEO Daniel Loepp, 65, was $16.9 million in 2022. Of that amount, $13.8 million was Loepp's bonus and $1.7 million his base salary. His total compensation was up $1.3 million from the year before, although still below Loepp's record $19.2 million payday in 2018."[1]

27.     Because Wesco is in the convenience store and gas station business, not healthcare, it hired BCBSM, a self-proclaimed expert in plan administration and healthcare claims processing, to serve as the Plan's claims administrator.

28.     This arrangement is governed by ERISA, 29 U.S.C. § 1001, *et seq.*, and the terms of Wesco's Plan.

29.     Section 1132(a)(2) authorizes plan sponsors, like Wesco (and the plan sponsors in the putative Class), to bring a civil suit for, and on behalf of the Plan (or their self-funded plans), for the relief specified in § 1109(a).  29 U.S.C. § 1132(a)(2).

---

[1] JC Reindl, *Michigan Blue Cross CEO Daniel Loepp earned $17M in cash in 2022*, DETROIT FREE PRESS (March 2, 2023), https://www.freep.com/story/money/business/2023/03/01/michigan-blue-cross-ceo-daniel-loepp-earnings-2022/69958779007/.

6

Section 1109, in turn, makes a fiduciary, like BCBSM, who breaches a fiduciary duty, "personally liable to make good to such plan any losses to the plan resulting from each such breach" and "to restore to such plan any profits" resulting from the breach.   29 U.S.C. § 1109(a).

30.    This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because Plaintiffs' representative claims arise under ERISA, and under 29 U.S.C. § 1132(e) because this action is brought by a fiduciary for relief under ERISA.

31.    This Court has personal jurisdiction over BCBSM because ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), provides for nationwide service of process, and BCBSM is a resident of the United States and subject to service in the United States.

32.    This Court has personal jurisdiction over BCBSM pursuant to Fed. R. Civ. P. 4(k)(1)(A) because BCBSM is subject to the jurisdiction of a court of general jurisdiction in Michigan:  it resides or may be found in this district or has consented to jurisdiction in this district. Further, this Court has personal jurisdiction over BCBSM because a substantial portion of the wrongdoing alleged in this Complaint took place in the State of Michigan; it is authorized to do business in Michigan; it conducts business in Michigan and this District, and has its principal place of business in this District; it advertises and promotes its services in the State of Michigan and this District; and it intentionally marketed and sold insurance and related products and services in the State of Michigan and in this District.

33.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because BCBSM resides in the Eastern District of Michigan and a substantial part of the events giving rise to the claim occurred in the Eastern District of Michigan.

34.     Venue is also proper pursuant to 29 U.S.C. § 1132(e)(2) because some or all fiduciary breaches and prohibited transactions for which relief is sought occurred in or originated in this District.

35.     This action is further brought as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure.

## FACTUAL ALLEGATIONS

36.     Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs.

### A.     BCBSM FUNCTIONED (AND CONTINUES TO FUNCTION) AS AN ERISA FIDUCIARY TO ITS SELF-FUNDED PLAN CUSTOMERS.

37.     Entities like BCBSM—who exercise discretionary authority over management or administration of a plan, or who control plan assets—are fiduciaries under ERISA.  29 U.S.C. § 1002(21)(A).

38.     Additionally, service providers like BCBSM are ERISA fiduciaries when they exercise discretionary authority or control over plan management or disposition of plan assets—including when setting and collecting their own fees pursuant to a contract.  *See, e.g., Tiara Yachts, Inc. v. Blue Cross Blue Shield of Michigan*, No. 24-1223, 2025 WL 1453273, at *9 (6th Cir. May 21, 2025) ("BCBSM

acted as an ERISA fiduciary by exercising discretion over its own compensation for the SSP."); *Rozo v. Principal Life Ins. Co.*, 949 F.3d 1071, 1074 (8th Cir. 2020) ("A service provider may be a fiduciary when it exercises discretionary authority, even if the contract authorizes it to take the discretionary act."); *Saginaw Chippewa Indian Tribe of Mich. v. Blue Cross Blue Shield of Mich*., 32 F.4th 548, 563 (6th Cir. 2022) (SCIT) (controlling and "failing to preserve plan assets" gives rise to fiduciary duties); *Guyan Int'l, Inc. v. Prof'l Benefits Adm'rs*, *Inc.*, 689 F.3d 793, 798 (6th Cir. 2012) ("[A]n entity that exercises *any* authority or control over disposition of a plan's assets becomes a fiduciary.") (emphasis in original); *Hi-Lex Controls v. BCBSM*, 751 F.3d 740, 745-46 (6th Cir. 2014) (when "BCBSM held plan assets of the Hi-Lex Health Plan [it] functioned as an ERISA fiduciary.").

39.     Wesco hired BCBSM to administer the Plan, including to provide administrative services associated with processing and paying medical claims.

40.     Specifically, BCBSM and Wesco entered into an administrative services contract ("ASC"), drafted by BCBSM, and effective December 1, 2003.

41.     The ASC was negotiated and newly executed year-after-year by the parties, until Wesco terminated the relationship at the end of December of 2022.

42.     Under the ASC, BCBSM had discretionary authority and control over management and administration of the Plan, was responsible for interpreting the

Plan's terms, calculating benefits, deciding whether to grant or deny claims on Wesco's and its Plan's behalf, and ultimately paying providers from Plan assets.

43.     Further, BCBSM administered Wesco's Plan by approving and paying covered healthcare claims for the Plan using monies Wesco provided, or by denying those claims, in its discretion.

44.     In exchange, Wesco paid BCBSM a monthly fee and periodically deposited money into a BCBSM-owned account, from which BCBSM paid claims.

45.     Specifically, Wesco (as the Plan sponsor) and the Plan pre-funded a BCBSM-owned and BCBSM-controlled bank account, on a periodic basis, from which BCBSM would draw money to pay claims, Plan expenses, and fees BCBSM imposed in its sole discretion—including the SSP fees at issue in this case that BCBSM paid itself.

46.     These prepayments sent to BCBSM's bank account are "Plan Assets" as defined by ERISA § 3(42), 29 U.S.C. § 1002(42).  *See Hi-Lex Controls, Inc. v. BCBSM*, 751 F.3d 740, 745-46 (6th Cir. 2014) (employer contributions in BCBSM's bank account, held in trust to pay benefits are "plan assets" under ERISA).

47.     BCBSM had complete discretionary control and authority over this bank account and the Plan assets sent to it, including, but not limited to, discretionary check-writing authority over that account.  *See Tiara Yachts, Inc. v. Blue Cross Blue Shield of Michigan*, No. 24-1223, 2025 WL 1453273, at *1 (6th Cir. May 21, 2025)

10

(BCBSM "decided what claims to pay and for how much, [and] then wrote checks to medical providers out of the Plan's assets.").

48.    BCBSM also used such authority and control to pay itself from the bank account, in its discretion.

49.    "[E]xercising 'any authority or control' over **plan assets** is sufficient to make BCBSM a fiduciary" under ERISA, which BCBSM did in this case.  *See Tiara Yachts, Inc. v. Blue Cross Blue Shield of Michigan*, No. 24-1223, 2025 WL 1453273, at *6 fn 6 (6th Cir. May 21, 2025) (emphasis added).

50.    BCBSM therefore functioned as an ERISA fiduciary of the Plan (and continues to function as an ERISA fiduciary of the plans established by the members of the Class).

51.    Specifically, BCBSM exercised: (1) discretionary authority and control with respect to the administration and management of the Plan; (2) discretionary authority and meaningful control with respect to management and disposition of Plan assets, including controlling the number and amount of claims adjudicated or paid, the allocation of Plan assets to itself for fees (including the SSP fees at issue in this case), and deciding which claims would be paid or denied under the terms of the Plan; and (3) discretionary authority and control to interpret Plan terms.

52.    BCBSM also had discretionary authority and control to receive and review claims for Plan benefits, determine Plan benefits, and, if any were payable,

calculate and disburse payments of Plan benefits to healthcare providers from Plan assets.

53.   Specifically, BCBSM had the authority to write checks on the Plan account and through its own claims-processing procedures and systems, exercised control over where, how much, and when Plan assets were disbursed—including both to itself and to providers. *See Tiara Yachts, Inc. v. Blue Cross Blue Shield of Michigan*, No. 24-1223, 2025 WL 1453273, at *4 (6th Cir. May 21, 2025) (finding BCBSM acted as a fiduciary when it "'had the authority to write checks on the Plan account'" and exercised "'control over where Plan funds were deposited and how and when they were disbursed.'") (internal citation omitted).

54.   BCBSM also had discretionary control and authority over the entire "claims-processing apparatus" and administration of Wesco's Plan (and the Class members' plans), and BCBSM "also exercised discretion in setting its compensation under the SSP." *See Tiara Yachts, Inc. v. Blue Cross Blue Shield of Michigan*, No. 24-1223, 2025 WL 1453273, at *7 (6th Cir. May 21, 2025).

55.   As explained further below, BCBSM self-dealt with Wesco (and the Class members') Plan assets by overpaying or allowing overpayments on claims to increase the amount of SSP fees it collected in this case, which failed to preserve Plan assets and "gives rise to fiduciary duties." *Tiara Yachts, Inc. v. Blue Cross Blue Shield of Michigan*, No. 24-1223, 2025 WL 1453273, at *3 (6th Cir. May 21, 2025).

56.     Therefore, BCBSM was an ERISA fiduciary with respect to the Plan as it exercised authority and control over Plan assets, and discretionary authority and control over plan management and administration. *See Tiara Yachts, Inc. v. Blue Cross Blue Shield of Michigan*, No. 24-1223, 2025 WL 1453273, at *4-7 (6th Cir. May 21, 2025).

57.     Each Class member, as defined below, hired BCBSM to administer its respective ERISA governed plan under the same or substantially similar terms, and granted BCBSM discretionary control and authority in the management and administration of their self-funded plan, giving rise to ERISA fiduciary duties.

58.     Regardless of the terms of any ASC or administrative services only arrangement, BCBSM's collection of the SSP fees is itself an act of discretion and control of plan assets, creating a fiduciary relationship between BCBSM and any plan from which it collected SSP fees.

**B.     BCBSM'S FIDUCIARY DUTIES UNDER ERISA.**

59.     ERISA imposes strict fiduciary duties upon plan fiduciaries like BCBSM.

60.     ERISA § 404(a), 29 U.S.C. § 1104(a), states, in relevant part, that:

[A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and— for the exclusive purpose of providing benefits to participants and their beneficiaries; and defraying reasonable expenses of administering the plan; with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with

13

such matters would use in the conduct of an enterprise of like character and with like aims; by diversifying the investments of the plan so as to minimize the risk of large losses, unless the circumstances it is clearly prudent not to do so; and in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this subchapter and subchapter III.

61.     **The Duty of Loyalty**. ERISA imposes on a plan fiduciary the duty of loyalty:  to "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . for the exclusive purpose of . . . providing benefits to participants and their beneficiaries . . . ." 29 U.S.C. § 1104(a)(1)(A).

62.     The duty of loyalty entails a duty to avoid conflicts of interest and to resolve them promptly when they occur.

63.     A fiduciary must always administer a plan with an eye single to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor.

64.     **The Duty of Prudence**. Section 404(a)(1)(B) also imposes on a plan fiduciary the duty of prudence:  "to discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man, acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims . . . ." 29 U.S.C. § 1104(a)(1)(B).

65.   **The Duty to Inform and Disclose**. The duties of loyalty and prudence include the duty to disclose and inform. These duties entail: (a) a negative duty not to misinform; (b) an affirmative duty to inform when a fiduciary knows or should know that silence might be harmful; and (c) a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries.

66.   **The Duty to Pay No More Than Reasonable Fees.** A fundamental obligation of an ERISA fiduciary is to charge and receive only reasonable fees. ERISA § 406 specifically prohibits a fiduciary from charging or receiving unreasonable or unnecessary fees.  29 U.S.C. § 1108(b).

67.   **Prohibited Transactions.** ERISA's prohibited transaction rules bar fiduciaries from certain acts because they are self-interested or conflicted and therefore become per se violations of ERISA § 406(b)—or because they are improper "party in interest" transactions under ERISA § 406(a).  Under ERISA, a "party in interest" includes a fiduciary like BCBSM and entities providing any "services" to a plan, like BCBSM.  *See* ERISA § 3(14), 29 U.S.C. §1002(14). ERISA's prohibited transaction rules are closely related to ERISA's duties of loyalty.

68.   **The Duty to Monitor**. In addition, a fiduciary that appoints another person to fulfill all or part of its duties, by formal or informal hiring, subcontracting, or delegation, assumes the duty to monitor that appointee to protect the interests of the ERISA participants and beneficiaries.

69.     The power to appoint, retain, and remove plan fiduciaries or service providers confers fiduciary status upon the person holding such power.

70.     **Non-fiduciary Liability**. Under ERISA, any person or entity that is neither a fiduciary nor party-in-interest who knowingly participates in a fiduciary breach is liable for certain relief under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3).

71.     Accordingly, even ignoring BCBSM's fiduciary or party-in-interest status, it must restore unjust profits or fees and is subject to other appropriate equitable relief regarding the transactions at issue in this action pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), and well-established case law.

72.     **Rights of Action Under the Plans, for Fiduciary Breach and Prohibited Transactions**. ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes individual participants and fiduciaries to bring suit "(A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan." The remedies available pursuant to § 502(a)(3) include remedies for breaches of fiduciary duties set forth in ERISA §406, 29 U.S.C. § 1106. Further, ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), permits a plan participant, beneficiary, or fiduciary to bring a suit for relief under ERISA § 409.

16

73.    ERISA § 409, 29 U.S.C. § 1109, provides, *inter alia*, that any person who is a fiduciary with respect to a plan and who breaches any of the responsibilities, obligations, or duties imposed on fiduciaries by ERISA shall be personally liable to make good to the plan any losses to the plan resulting from each such breach and to restore to the plan any profits the fiduciary made through use of the plan's assets.

74.    ERISA § 409 further provides that such fiduciaries are subject to such other equitable or remedial relief as a court may deem appropriate.

75.    In sum, BCBSM's fiduciary duties entailed (and continue to entail) *inter alia*: the (a) duty to act prudently to ensure claims are adjudicated and paid correctly and accurately; (b) duty to act with the prudence, care, and diligence that ensures that improper payments and avoidable mistakes when administering the plan do not occur; (c) duty of loyalty to act in the best interests of the plan, including refraining from self-dealing or otherwise mismanaging, mis-adjudicating, or causing Plaintiffs (or any Class members) to pay improper payments; (d) duty to monitor, inform, and disclose all material information to Plaintiffs (and the Class members), regarding its administration of the Plan and payment of claims, including a duty to convey accurate information and an affirmative duty to inform when BCBSM knows (or should know) that silence regarding any mis-adjudicated or improper payments may cause harm to Wesco or the Plan; and (e) duty to charge and receive only reasonable fees from Plaintiffs (and the Class members).

17

76.     As detailed further below, BCBSM breached such fiduciary duties in serving as Wesco's and Class members' claims administrator by deliberately setting up the SSP program to pay itself 30% fees for fixing its own claim administration mistakes after mis-adjudicating or improperly paying (or overpaying) on claims. This "self-dealing" is prohibited by ERISA.

## C.  BCBSM'S INTERNAL SYSTEMS CAUSE ITS SELF-FUNDED CUSTOMERS TO OVERPAY ON CLAIMS.

77.     BCBSM uses common claims-processing systems through which it adjudicates, processes, and pays healthcare claims for its ASC customers and plans.

78.     BCBSM's common claims-processing systems utilize standard claim forms and codes (e.g., HCPCS codes, etc.) to adjudicate, process, and pay healthcare claims.

79.     BCBSM knowingly uses its internal claims-processing systems to regularly mis-adjudicate, mismanage, and/or otherwise cause its self-funded customers to pay improper claims—or to allow those errors to occur—costing BCBSM's self-funded customers and their plans (including Plaintiffs and the Class members) hundreds of thousands (if not millions) of dollars.

80.     For example, a former BCBSM employee (Dennis Wegner) previously filed suit under the Michigan Whistleblowers' Protection Act against BCBSM sounding the alarm on an internal BCBSM system that was causing certain BCBSM

self-funded customers to overpay on medical claims by hundreds of thousands of dollars. *See Dennis Wegner v. BCBSM*, No. 19-001808-CD (Wayne Cnty. Cir. Ct.).

81.     In short, Mr. Wegner discovered that, through certain flaws with an internal system known as "flip logic," which BCBSM and its management knew about, BCBSM's internal claims processing systems would allow healthcare providers to bill and get fully reimbursed for highly inflated costs of services.

82.     Essentially, BCBSM's claims-processing systems would pay whatever a provider charged for a service, regardless of whether the claim was proper under the plan terms or other applicable reimbursement guidelines and policies.

83.     But the "issues with BCBSM's claims processing *extend beyond flip logic*." *Tiara Yachts, Inc. v. Blue Cross Blue Shield of Michigan*, No. 24-1223, 2025 WL 1453273, at *2 (6th Cir. May 21, 2025) (emphasis added).

84.     As another example, a recent independent audit of BCBSM's claims processing and payments conducted on behalf of another BCBSM self-funded customer identified over $9 million in claims improperly processed and paid by BCBSM using that self-funded plan's assets. *See Comau LLC v. Blue Cross Blue Shield of Michigan*, Case no. 2:19-cv-12623, ECF No. 57 (unsealed expert report).

85.     Specifically, that audit revealed BCBSM's internal claims processing systems for its self-funded plans regularly pay claims that have the following errors, among others:  duplicate bills, unbundled claims, upcoded claims or claims with the

19

incorrect code billed, claims for medically unlikely services, and claims that do not adhere to standard payment guidelines:

- **Unbundling.** Unbundling is when a health care service provider uses the billing codes for two or more separate procedures when the procedures were performed together and only one code should be paid. As the Plan administrator tasked with responsibility of processing claims, BCBSM should not allow and pay unbundled claims.

- **Medically Unlikely Edits (MUE).** A MUE for a code is the maximum units of service that a provider would report under most circumstances for a single patient on a single date of service. In other words, MUEs represent an upper limit that unquestionably requires further documentation to support. These edits are designed to limit improper payments and/or coding errors. As the Plan administrator tasked with responsibility of processing claims, BCBSM should not allow and pay claims that exceed the maximum number of units allowed.

- **Upcoding.** Upcoding occurs when health care providers submit inaccurate billing codes to insurance companies in order to receive inflated reimbursements. As the Plan administrator, BCBSM should not allow or pay upcoded claims.

- **Non-Adherence to Payment Guidelines.** Payment guidelines are established to determine the appropriate reimbursement amounts when processing a claim. In general, Payment Guidelines dictate the reimbursement methodology used to determine the maximum allowable for any given service and provider type. As the Plan administrator, BCBSM must adhere to payment guidelines when processing and paying claims.

86.   These improper payment errors are *non-exclusive* examples of known errors presently existing in BCBSM's claims processing systems for its self-funded plan customers.

20

87.     As the Sixth Circuit has noted: "The platform[s] BCBSM use[s] to manage claims for all similarly situated customers, … suffer from 'processing errors' that allo[w] providers to improperly code for their services and overbill" BCBSM's self-funded customers, which "'consistently result[s] in improper payments of claims.'" *Tiara Yachts, Inc. v. Blue Cross Blue Shield of Michigan*, No. 24-1223, 2025 WL 1453273, at *2 (6th Cir. May 21, 2025).

88.     The same is true for Plaintiffs and the Class members—BCBSM has consistently mis-adjudicated, mismanaged, or otherwise improperly paid (*e.g.*, overpaid) claims from providers, using the Plan's assets and the Class members' plan assets.

## D.     BCBSM'S "SHARED SAVINGS PROGRAM."

89.     Rather than fix these known errors in its claims processing and payment systems, BCBSM instead opted to capitalize on them for economic gain. Specifically, BCBSM imposed on all its self-funded customers a program designed to allow BCBSM to profit off its own mistakes and mismanagement, misleadingly calling it the "Shared Savings Program" ("SSP").

90.     BCBSM unilaterally enrolled all self-funded customers, including Plaintiffs and the members of the Class, in its SSP.

91.     BCBSM misrepresented its SSP as a "payment integrity" initiative, *i.e.*, a program designed to ensure providers are only paid what they are owed.

21

92.     But, BCBSM has used its SSP to squander Plaintiffs' and the Class member's plan assets by systematically engaging in improper, wasteful, and abusive practices, including mis-adjudication, mismanagement, and/or improperly paying or overpaying on claims.

93.     BCBSM then profits from its mis-adjudication and mismanagement by "catching" its own errors—such as by stopping the payment or clawing it back—and keeping a portion of such so-called "savings" for itself.

94.     Under the SSP, BCBSM purports to provide various services that aim to detect and prevent future overpayments of claims before they occur, or claw back past overpayments from providers that have already occurred.

95.     In exchange for those services, BCBSM retains 30% of the payments that BCBSM either recovered or prevented the Plan from paying.

96.     When one scratches below the surface, however, BCBSM developed its SSP *not* to benefit customers like Plaintiffs and the Class members; instead, BCBSM uses its SSP to profit from its own mismanagement of plan assets.

97.     Critically, BCBSM has discretionary control and authority over the number and amount of improper payments made on behalf of Plaintiffs (and the Class members) because BCBSM decides which claims to adjudicate (*i.e.*, approve or deny), determines how much to pay for them, and then makes the payments.

98.     In that instance, BCBSM's discretionary control on the front end over the entire claims-processing apparatus for Wesco and the Class member's plans means BCBSM also controls and exercises discretion in setting its compensation under its SSP.

99.     Indeed, the more improper claims BCBSM allows or pays using Plaintiffs' (and the Class members') plan assets on the front end, the more money it makes on the back end—by subsequently undoing the improper payments (that should have been denied in the first place) and unilaterally collecting a 30% fee.

100.    For example, one of the services BCBSM purports to provide through its SSP is referred to as Forensic Bill Review (or Hospital Bill Review).  BCBSM describes this service as involving a detailed "line-by-line" itemized review of each claim, to "identify defects and improprieties *before the bill is paid*."

101.    At first blush, that description may seem as if BCBSM is doing its self-funded ASC customers a favor.  However, the below example demonstrates how the SSP program works in reality:

| SSP EXAMPLE | | | |
|---|---|---|---|
| **Part 1 - BCBSM improperly adjudicates upcoded claim** | | **Part 2 - BCBSM secretly collects fees for "catching" its "error"** | |
| Hospital submits an inflated bill for $10,000 for an improperly upcoded procedure | Rather than conduct a proper review of the claim upon submission and deny the claim, BCBSM slides it through its first-pass review | BCBSM then "catches" its error on second-pass review and pays $0, *i.e.*, what should have been adjudicated the first time | BCBSM collects a 30% fee of $3,000 (($10,000-$0) x 30%), for "catching" its own error |
| **Outcome –** <br> • **BCBSM enriches itself at the Plan's expense with a $3,000 SSP fee.** <br> • **The claim remains unresolved; the Plan remains potentially liable.** | | | |

102.   Such nefarious self-dealing—*including through all other services BCBSM purports to provide via its SSP*—was always the intent of BCBSM's implementation of the program.

103.   BCBSM created its SSP to:  (1) drive sustainable margin improvement for itself; (2) increase underwriting gain for itself; and (3) generate shared savings revenue for itself, in conflict with its fiduciary duties to make all its decisions relative to the Plan with the best interests of Plan participants and beneficiaries in mind.

**E.   BCBSM'S SHARED SAVINGS PROGRAM VIOLATES ERISA.**

104.   BCBSM has breached its fiduciary duties and engaged in unlawful self-dealing under ERISA by using its discretionary authority and control to squander plan assets through mis-adjudicating, mismanaging, and/or causing Plaintiffs (and

Class members) to pay improper claims, only to then turn around and under the guise of its SSP charge fees (up to 30%) for the correction of its own "mistakes," which it misleadingly describes as "savings."

105.   Such "mistakes" should never have been made by BCBSM because they were in breach of BCSBM's fiduciary duties.

106.   BCBSM is self-interested in not contesting inflated and improper bills at the forefront because the SSP system it unilaterally created allows BCBSM to use such inflated amounts to calculate SSP fees it collects from the Plan's assets.

107.   Worse, despite BCBSM affirmatively representing to Plaintiffs and the Class members that it "has implemented [its SSP] to enhance the savings realized by its customers," including in identifying defects and improprieties before any bill is paid, BCBSM conducts no or insufficient adjudicative review when an improper claim is submitted.

108.   The more improper and inflated claims BCBSM allows (even preliminarily), processes, and pays using Plaintiffs' and the Class members' plan assets on the front end, the more money BCBSM makes on the back end.

109.   The result of BCBSM's SSP program has left Wesco and its Plan (and the Class members and their plans) with unanticipated and onerous fees, all the while dumping millions of dollars into the coffers of BCBSM.

110.    Examples of such unlawful SSP "fees" that BCBSM has unilaterally collected from Wesco and its Plan include the following:

- $22,576 fee misleadingly described by BCBSM as a fee for "BCBSM PAYMENT INTEGRITY SHARE/ADMIN COMP";
- $4,415 fee misleadingly described by BCBSM as a fee for "BCBSM PAYMENT INTEGRITY SHARE/ADMIN COMP";
- $1,516 fee misleadingly described by BCBSM as a fee for "BCBSM PAYMENT INTEGRITY SHARE/ADMIN COMP"; and
- $7,274 fee misleadingly described by BCBSM as a fee for "BCBSM PAYMENT INTEGRITY SHARE/ADMIN COMP".

111.    Several courts, including the Sixth Circuit Court of Appeals, have ruled that SSP fees like those BCBSM has collected from Plaintiffs and Class members present a conflict of interest in violation of a claim administrator's fiduciary duties under ERISA and are prohibited self-dealing.  See, e.g., *Tiara Yachts, Inc. v. Blue Cross Blue Shield of Michigan*, No. 24-1223, 2025 WL 1453273, at *3 (6th Cir. May 21, 2025) (finding that "ERISA treats self-dealing transactions" like those alleged by plaintiff concerning BCBSM paying itself shared savings program fees as "presumptively unlawful"); *TML Recovery, LLC v. Cigna Corp.*, No. SA CV 20-00269-DOC (ADS), 2024 WL 1699512, at *11 (C.D. Cal. Mar. 18, 2024) ("a conflict of interest exists regarding plans using Cigna's cost containment program" because "[u]nder ERISA, Cigna has a duty to make claim determinations 'solely in the interests of the [plan's] participants and beneficiaries,'" but "[t]he percentage of fees that Cigna receives in exchange for its cost containment program gives rise to a certain 'degree of skepticism,' as it could incentivize Cigna to under-reimburse

claims in order to earn a higher percentage of savings."); *Stewart, et al., v. Cigna Health and Life Ins. Co*., No. 3:22-cv-769 (OAW), 2024 WL 1344796, at \*5 (D. Conn. Mar. 30, 2024) (plaintiffs—on behalf of a class of plan participants in Cigna plans—stated a claim that Cigna breached its ERISA fiduciary duties by paying providers in contravention of the Plan and contracts in order to enrich itself with excessive "cost containment" fees it collected as a "percentage of savings" between the providers' billed charges and paid amounts); *Popovchak v. UnitedHealth Grp. Inc.*, No. 22-CV-10756 (VEC), 2023 WL 6125540, at \*1 (S.D.N.Y. Sept. 19, 2023) ("Plaintiffs adequately allege a claim for breach of the duty of loyalty because they accuse Defendants of using Repricer data to collect 'savings' fees, despite Defendants' failure to secure corresponding savings, for the primary purpose of enriching themselves at Plan members' expense.  In other words, Defendants allegedly failed to make decisions 'with an eye single to the interests of the Plans' participants and beneficiaries'").

112.   BCBSM was obligated as the Plan's claim administrator to employ adequate policies, procedures, and safeguards to detect and reject health care claims submitted to Plaintiffs that were improper or inflated, which BCBSM did not do.

113.   Indeed, BCBSM's fiduciary duties (as outlined above) required it to, among other things: (a) act prudently to ensure the Plan's claims were being adjudicated and paid correctly and accurately; (b) act with prudence, care, and

diligence that ensured that improper payments and avoidable mistakes when administering the Plan were not occurring; and (c) act in the best interests of the Plan, including refraining from self-dealing or otherwise mismanaging, mis-adjudicating, or causing Plaintiffs (or Class members) to pay improper payments.

114.    BCBSM also failed to fully inform and disclose all relevant and material information concerning BCBSM's SSP to Plaintiffs, including any claims that had been mismanaged or flaws within its claims processing systems that serve as the purported basis for the SSP fees it charges.

115.    Further, BCBSM regularly impedes its self-funded customers, including Plaintiffs and the Class members, from being able to fully evaluate and review their claims data by rejecting their requests to provide claims data.

116.    Despite Wesco's repeated requests for its Plan's claims data, which would identify additional BCBSM overpayments and fiduciary breaches, BCBSM has refused to provide Plaintiffs with such claims data.

117.    Instead, BCBSM has abused its position as claims administrator to extract higher fees and compensation at the expense of Plaintiffs and BCBSM's other self-funded customers (i.e., the Class) in violation of its duties under ERISA.

### F.  PLAINTIFFS HAVE BEEN DAMAGED BY BCBSM'S MISCONDUCT.

118.    Wesco and its Plan have been damaged because of BCBSM's breaches of fiduciary duty and self-dealing described above.

28

119.   Such damages include, among others, the monies Wesco contributed to the Plan on behalf of Plan participants that could have been used for Plan benefits, had BCBSM exercised its discretion over the processing and payment of claims properly and had BCBSM not engaged in fiduciary breaches or self-dealing as described above.

120.   BCBSM's malfeasance has further resulted in BCBSM improperly pocketing Plan assets for itself in the form of SSP fees.

121.   Accordingly, Plaintiffs bring this action on behalf of all self-funded plans and plan sponsors comprising the Class against BCBSM to recover losses suffered by Plaintiffs and the Class members due to BCBSM's violations of ERISA, to obtain restitution and disgorgement of SSP fees, recover Plaintiffs' attorneys' fees, costs, and expenses in being forced to bring this action, and be awarded all other appropriate relief, legal or equitable, that this Court deems just and proper.

## CLASS REPRESENTATION ALLEGATIONS

122.   Plaintiffs bring this action on their own behalf and as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure.  Plaintiffs seek to represent the following class ("Class"):

> All Self-Funded Plans and their Plan Sponsors from whom BCBSM has collected any SSP fees.

123.  For purposes of the Class definition set forth above, the term "Self-Funded Plan" means any account, employer-sponsored health benefit plan, or

group plan (including any associational entities, unions, etc.) that purchased, is covered by, participates in, or is enrolled in a self-funded product sold by or administered by BCBSM pursuant to an administrative services only arrangement.

124.  For purposes of the Class definition set forth above, the term "Plan Sponsors" means any "plan sponsor" of a Self-Funded Plan as the term is defined under Section 3(16)(B) of ERISA, 29 U.S.C. § 1002(16)(B).

125.  Excluded from the Class are: (1) BCBSM and any entities in which BCBSM has a controlling interest; and (2) Self-funded Plans and their Plan Sponsors that have settled or released claims against BCBSM alleging violations of ERISA for BCBSM's SSP fees.

126.  Plaintiffs reserve the right to amend or modify this Class definition consistent with the record.

127.  The putative class members' identities are readily ascertainable from BCBSM's records within its control.

128.  This action has been brought, and may properly be maintained, as a class action pursuant to the provisions of Rule 23 of the Federal Rules of Civil Procedure because there is a well-defined community interest in the litigation.

129.  The prerequisites to class-representation pursuant to Rule 23(a) are present in this action as follows:

      a.    **Numerosity**. The members of the Class are so numerous and geographically diverse that joinder of all of them is impracticable. The

30

exact number and identities of members of the Class are unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery.  However, Plaintiffs reasonably believe and therefore aver that there are hundreds (if not thousands) of Class members, particularly in Michigan where BCBSM is well-known to serve as a claims administrator for many self-funded plans.

b.   **Commonality**. There are questions of fact and law common to the claims of Plaintiffs and the members of the Class that predominate over any questions affecting any individual member including, but not limited to, the following questions:

    i.   Whether BCBSM breached its fiduciary duties owed to self-funded plans by implementing a mandatory SSP, granting it discretion to collect SSP fees discretionarily and unilaterally from self-funded plans' assets under BCBSM's control;

    ii.   Whether BCBSM engaged in per se prohibited transactions by implementing and collecting SSP fees from self-funded plans' assets.

c.   **Typicality**. Plaintiffs' claims are typical of the claims of other members of the Class in that Plaintiffs allege a common course of conduct by BCBSM towards members of the Class. Plaintiffs, like other members of the respective Class, are subject to the same administrative services arrangement with BCBSM, contribute plan assets to the BCBSM owned and controlled bank account(s) to cover plan health care claims, were forced into the SSP, and were then subject to BCBSM's discretionary and unilateral SSP fees it collected from the plans' assets entrusted to BCBSM in violation of ERISA.  Plaintiffs and the other members of the Class seek identical remedies under identical legal theories, and there is no antagonism or material factual variation between Plaintiffs' claims and those of the respective Class.

d.   **Adequacy**. Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs' claims are coextensive with, and not antagonistic to, the claims of the other members of the Class where the claims are identical and any outcome, i.e., judgment in Plaintiffs and the Class's favor, including awards of fees or mandated action by BCBSM, in no way conflict.  Plaintiffs are willing and able to vigorously prosecute this action on behalf of the Class, and Plaintiffs retained counsel experienced in handling ERISA lawsuits and complex legal issues, and

31

neither Plaintiffs nor their counsel have any interests which might cause them not to vigorously pursue this action.

130.   Plaintiffs bring this action in reliance upon Rule 23(b)(3) of the Federal Rules of Civil Procedure.

131.   As to Rule 23(b)(3), this class action is appropriate for certification because questions of law and fact common to the members of the Class predominate over questions of law and fact affecting individual members of the Class.  Indeed, the predominant issues in this action are whether BCBSM violated ERISA by breaching its fiduciary duties owed to self-funded plans when implementing a mandatory SSP permitting it to collect fees discretionarily and unilaterally from plan assets, and whether BCBSM engaged in *per se* prohibited self-dealing by implementing and assessing fees under the SSP.

132.   Importantly, it is settled law in the Sixth Circuit that BCBSM acts as an ERISA fiduciary in its relationships under its ASC arrangements with self-funded plans when it collects variable and discretionary fees like the SSP fees from self-funded plans' assets. *See Tiara Yachts, Inc. v. Blue Cross Blue Shield of Michigan*, No. 24-1223, 2025 WL 1453273, at *8 (6th Cir. May 21, 2025) ("BCBSM acted as an ERISA fiduciary by exercising discretion over its own compensation for the SSP"); *Hi-Lex Controls v. BCBSM*, 751 F.3d 740, 746 (6th Cir. 2014) ("While BCBSM attempts to characterize its arrangement with Hi–Lex as a service agreement between two companies—with no thought toward ERISA and its

protections—that argument is unavailing . . . . the district court did not err in finding that BCBSM held plan assets of the Hi–Lex Health Plan and, in doing so, functioned as an ERISA fiduciary.").

133.   Similarly, the business arrangements BCBSM has with each of its self-funded customers and plans are the same (or substantially similar) as the arrangement Plaintiffs have with BCBSM described above.

134.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because joinder of all the hundreds (or thousands) of plan sponsors and self-funded plans who engaged BCBSM as their administrator and were enrolled in the SSP is impracticable, and many plan sponsors and self-funded Plans will not raise these claims on their own.

135.   Absent a class action, some or all Class members would likely find the cost of litigating prohibitively high, particularly for those who may have been assessed a SSP fee only a few times and, therefore, would have no effective remedy at law.  The expense of litigating each Class member's claim individually would be so cost-prohibitive as to deny Class members a viable remedy.

136.   Further, should individuals in the Class be required to bring separate actions, the courts would be confronted with a multiplicity of lawsuits burdening the court system, while also creating risk of inconsistent rulings and contradictory judgments.  In contrast to proceeding on a case-by-case basis, in which inconsistent

results will magnify the delay and expense to all parties and the court system, this class action presents far fewer management difficulties while providing unitary adjudication, economies of scale, and comprehensive supervision by this Court for the issues raised concerning BCBSM's SSP.

137.   Certification under Rule 23 of the Federal Rules of Civil Procedure is, therefore, appropriate because a class action is superior to the other available methods for the fair and efficient adjudication of this action, and Plaintiffs envision no unusual difficulty in the management of this action as a class action.

138.   Based on discovery and further investigation, Plaintiffs may, in addition to moving for class certification, use modified definitions of the Class, Class claims, and the class period, and/or seek class certification only as to particular issues, as permitted under Rule 23.

## COUNT I
## PROHIBITED TRANSACTIONS UNDER ERISA

139.   Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs.

140.   At all times relevant, and with respect to the actions described above, BCBSM was both a "fiduciary" pursuant to 29 U.S.C. § 1002(21)(A) and a "party in interest" pursuant to 29 U.S.C. § 1002(14).  *See Tiara Yachts, Inc. v. Blue Cross Blue Shield of Michigan*, No. 24-1223, 2025 WL 1453273, at *8 (6th Cir. May 21, 2025); *Loren v. Blue Cross & Blue Shield of Michigan*, No. 05-74908, 2008 WL

723537 at *4, n 4 (E.D. Mich. Mar. 17, 2008) (citing 29 U.S.C. § 1002(14)(B) ("[A]

party in interest as to an employee benefit plan include 'a person providing services

to such plan'" such as BCBSM)).

141.   Therefore, under 29 U.S.C. § 1106, BCBSM was prohibited from

engaging in certain transactions as set forth in 29 U.S.C. § 1106 and from dealing

with the assets of the Plaintiffs' and Class in its own interest or for its own account.

142.   As described above, BCBSM's collections of SSP fees were prohibited

transactions because, among other things, (a) they constituted a transfer to, or use by

or for the benefit of, BCBSM of the Plaintiffs' assets and any Class members' assets,

and (b) BCBSM dealt with Plaintiffs' assets and Class members' assets in its own

interest and for its own account.

143.   As described above, BCBSM instituted a mandatory SSP program

whereby it allocated to itself, from Plaintiffs and the Class members' assets, fees

calculated off its own mismanagement of Plaintiffs and Class members' assets.

144.   In other words, the more improper adjudications or other errors

BCBSM performed or allowed on the front end, the more fees BCBSM collected on

the back end.

145.   By instituting a system that allowed it to control the amount of its own

compensation and unjustly enrich itself, BCBSM dealt with the Plaintiffs' assets and

the Class members' assets in its own interest and for its own account in violation of Section 1106.

146. Whether Plaintiffs or other Class members "agreed" to pay SSP fees is immaterial, because the amount of the "recoveries" were in the unilateral control of BCBSM and are *per se* prohibited self-dealing transactions pursuant to 29 U.S.C. § 1106. *Tiara Yachts, Inc. v. Blue Cross Blue Shield of Michigan*, No. 24-1223, 2025 WL 1453273, at *6 (6th Cir. May 21, 2025) ("ERISA treats self-dealing transactions as 'presumptively unlawful[,]' no matter whether the plaintiff alleges the defendant acted out of fraud or imprudence.").

147. BCBSM knew or should have known that its collection of SSP fees constituted a direct "transfer to, or use by or for the benefit of a party in interest, of any assets of the plan." 29 U.S.C. § 1106(a)(1)(D).

148. Each time BCBSM paid itself a SSP fee it engaged in a new and separate per se prohibited activity, regardless of intent, soundness of the transaction, or absence of harm.

149. BCBSM's violation of 29 U.S.C. § 1106 has proximately caused substantial damages to Plaintiffs and the Class.

<u>**COUNT II**</u>
<u>**BREACH OF FIDUCIARY DUTY – ERISA**</u>

150.   Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs.

151.   Plaintiffs bring this Count individually and on behalf of all others similarly situated.  Wesco and the Class plan sponsors further bring these claims on behalf of their respective plans.

152.   Plaintiffs and the Class members placed trust and confidence in BCBSM, which BCBSM accepted when it agreed to serve as Plaintiffs' claims administrator.

153.   By agreeing to administer Wesco's and the Class members' plans, BCBSM was given significant discretionary authority and control over plan assets and over plan management or administration.

154.   As such, at all times relevant, BCBSM was a fiduciary pursuant to 29 U.S.C. § 1002(21)(A) with respect to Plaintiffs and the Class members because its actions with regard to the SSP fees it collected from Plaintiffs' plan assets and the Class members' plan assets constituted (a) an exercise of discretionary authority and control over management of the Plan and Class plans; and (b) an exercise of authority and control over management and disposition of the Plan and Class plan assets.  Further, BCBSM had discretionary authority and responsibility in the administration of the Plan and Class plans.

37

155. As a fiduciary, BCBSM was required, among other things, to:

- Conduct itself as an administrator with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent ERISA professional fiduciary would in administering the Plan and the Class plans;

- Discharge its duties with utmost loyalty and fidelity to the Plan, the Class plans, and their participants and solely in the interest of the employees and beneficiaries of the Plan and the Class plan's, avoiding at all times conflicts of interest, self-interest, and duplicity;

- Preserve Plan (and the Class plan's) assets for the exclusive purposes of providing benefits to participants in the Plan, the Class plans, and their beneficiaries and defraying reasonable expenses of administering the Plan and the Class plans;

- Track, account for, and fully disclose all transactions involving the Plan, the Class plans, and their assets so as to ensure that plan assets are retained, managed, and disbursed in compliance with the relevant plan documents and ERISA;

- Avoid making false or misleading statements, and abide by any statutory and contractual obligations or restrictions imposed on it;

- Ensure that the fees and expenses incurred by the Plan and the Class plans are reasonable and incurred for the sole and exclusive benefit of the Plan and the Class plans participants and beneficiaries;

- To ensure that the payments from the Plan and the Class plans, whether they are direct or indirect, are reasonable, accurate, and correct for the services provided and made for the sole and exclusive benefit of plan participants and beneficiaries;

- In operating and administering the Plan and the Class plans, on an ongoing basis to monitor the payments made by the Plan and the Class plans to service providers, whether they are direct or indirect, to ensure they are and remain reasonable for the services provided and made for the sole and exclusive benefit of plan participants and beneficiaries;

- Upon request, to provide further information to Plan and the Class plans participants, beneficiaries, and fiduciaries regarding the administration of the Plan and the Class plans and the expenses incurred in doing so; and

- To provide honest, accurate, and complete information to Plan sponsors, participants, beneficiaries, and fiduciaries regarding the costs associated with their various benefit choices and directions.

156. Wesco and the Class plan sponsors have standing as fiduciaries to take action against BCBSM for BCBSM's breach of fiduciary duties on behalf of the Plan and the Class plans.

157. BCBSM breached its fiduciary duties in numerous ways, including, but not limited to:

- Knowingly using Wesco's Plan assets and Class plan assets to pay itself SSP fees based on BCBSM's own claim errors and mismanagement in the initial adjudication of claims;

- Mismanaging Plan and Class plan assets through making or causing to be made improper claim payments (e.g., overpayments) in order to extract excessive fees from Plan and Class plan assets through its SSP, in a clear conflict of interest;

- Failing to disclose, or providing material information concerning, its conflicts of interest and self-dealing in connection with the SSP fees it collected from the Plan and Class plans;

- Using its considerable discretionary authority to advance its own financial interests over those of the Plan and Class plans and plan participants;

- Failing to implement and exercise sufficient quality control and oversight of BCBSM's claims processing systems and discretionary review of claims pre- and post-payment;

- Intentionally and knowingly approving or paying grossly inflated and knowingly improper healthcare claims, as well as other improper payments as set forth above;

- Maximizing BCBSM's own profits, at the expense of the Plan, the Class plans, the Plan sponsor and Class plan sponsors, and participants and beneficiaries;

- Paying claims lacking standard information necessary to properly adjudicate claims in accordance with industry standards and BCBSM's own policies and procedures, or otherwise failing to maintain claims data necessary to identify and prevent incorrectly paid amounts and identify the full scope of BCBSM's misconduct and mismanagement;

- Failing to stop injuries to Wesco and the Plan, and Class plans, caused by BCBSM and/or its service providers;

- Failing to monitor BCBSM's appointees, formal delegees, and informal delegees in the performance of their fiduciary duties;

- Otherwise engaging in a pattern of conduct designed to mislead, confuse, deceive, and otherwise trick Plaintiffs and the Class into paying more for healthcare benefits than Plaintiffs and the Class plans were obligated to pay; and

- Failing to exercise the care, skill, prudence, and diligence under the circumstances that a prudent fiduciary acting in a like capacity and familiar with such matters would use in paying for health care claims, and otherwise administering its ERISA-governed self-funded plans subject to form ASCs.

158.   BCBSM's breaches of its fiduciary duties have proximately caused substantial damages to Plaintiffs and the Class.

## **<u>PRAYER FOR JUDGMENT</u>**

Plaintiffs Wesco Inc., and Wesco Inc. Cafeteria Plan and Employee Benefit

Plan, on behalf of a class of all others similarly situated, respectfully request the

Court to grant the following relief:

a.   Enter an order against Defendant BCBSM pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) certifying this action as a class action and appointing Wesco as the class representative;

b.   Enter an order appointing Varnum LLP as class counsel pursuant to Federal Rule of Civil Procedure 23(g);

c.   Enter an order declaring that BCBSM engaged in prohibited self-dealing in violation of 29 U.S.C. § 1106;

d.   Enter an order declaring that BCBSM breached its fiduciary duties and otherwise violated federal law by (1) charging and collecting the SSP fees; (2) mismanaging the Plan and Class plans' assets; (3) not exercising the care, skill, prudence, and diligence under the circumstances that a prudent fiduciary acting in a like capacity and familiar with such matters would use in paying for healthcare claims; and (4) not making decisions regarding Plan and Class plans' assets with an eye single to the interests of the participants and beneficiaries;

e.   Enter a judgment in favor of Plaintiffs and the Class awarding restitution for all improper uses of plan assets by BCBSM, including all SSP fees;

f.   Enter a judgment awarding all monetary damages to which Plaintiffs and the Class are entitled;

g.   Awarding Plaintiffs and the Class disgorgement of all SSP fees collected by BCBSM;

h.   Awarding Plaintiffs and the Class all costs and expenses of this action, and requiring BCBSM to pay the costs and expenses of class notice and administration;

i.   Awarding Plaintiffs and Class attorneys' fees (including statutory attorneys' fees under ERISA § 502(g)(1), 29 U.S.C. 1132(g)(1)) and statutory interest to the fullest extent of the law; and

j.   Awarding all other relief to which Plaintiffs and the Class may be entitled.

Respectfully submitted,

VARNUM LLP
*Attorneys for Plaintiffs*

Dated: June 9, 2025          By: _____

Perrin Rynders (P38221)
Aaron M. Phelps (P64790)
Herman D. Hofman (P81297)
Justin M. Wolber (P85728)
Bridgewater Place, P.O. Box 352
Grand Rapids, MI 49501-0352
(616) 336-6000
prynders@varnumlaw.com
amphelps@varnumlaw.com
hdhofman@varnumlaw.com
jmwolber@varnumlaw.com

42